Chas. SYER, Jr., and Virginia B. Syer,
Appellees,

v.

**UNITED STATES of America,**
Appellant.

No. 9850.

United States Court of Appeals
Fourth Circuit.

July 5, 1967.

Solomon L. Warhaftig, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attorneys, Department of Justice, and Claude V. Spratley, Jr., U. S. Atty., and William T. Mason, Jr., Asst. U. S. Atty., on brief), for appellant.

T. L. Sawyer (John M. Hollis and Willcox, Cooke, Savage & Lawrence, Norfolk, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and STERLING HUTCHESON, District Judge.

HAYNSWORTH, Chief Judge.

The Commissioner of Internal Revenue challenges the sufficiency of the evidence to support jury findings that a taxpayer was engaged in the business of dealing in corporations and that certain losses, deducted by the taxpayer as business bad debts, were incurred in connection with that business. We are of the opinion that the record does not contain sufficient

evidence to support the second finding, and accordingly, we reverse.

The losses in question were sustained in connection with the taxpayer's investment in the stock of American Tent and Awning Company. The company was primarily engaged in filling government contracts for canvas cloth and, because of the lengthy interval between completion of a contract and receipt of payment, it required loans to maintain an adequate cash position. As a condition to purchasing forty-nine percent of the company's stock, therefore, the taxpayer was required to guarantee certain loans made to the company by a bank. Although he disposed of his stock in 1955, he was unable to shift his obligation as guarantor, and when the company was forced into bankruptcy the taxpayer became liable for the unpaid balance of the loans. He paid them over a three year period, and, in each year, deducted the amount paid from ordinary income as a business bad debt pursuant to § 166(a) of the Internal Revenue Code of 1954.[1]

The Commissioner, contending that the taxpayer was not in the business of dealing in corporations, disallowed the deductions as business bad debts and assessed a deficiency in the taxpayer's returns for the years in question. After paying the assessments, the taxpayer, claiming that the loss was incurred in connection with a business of organizing and promoting corporations for resale, brought suit for refund. Following introduction of evidence, which consisted solely of testimony by the taxpayer, the Commissioner's motion for directed verdict on both the issue of the existence of such a business and the issue of the relation of the loss to it was denied, and the case was allowed to go to the jury. The verdict was favorable to the taxpayer, and the Commissioner

filed a timely appeal after his motion for judgment notwithstanding the verdict was denied.

■ Whether the taxpayer is engaged in the business of organizing and promoting corporations is essentially a question of fact,[2] and the burden of proving the existence of such a business and his participation in it rests upon the taxpayer.[3] He must not only prove that his participation in various enterprises was greater than that of an investor seeking profits from the operation of the businesses, but also that his purpose in organizing or rehabilitating companies was to develop them into going concerns for sale in the ordinary course of business.[4] Once this hurdle has been overcome, in order to succeed in his efforts to deduct the losses as business bad debts, the taxpayer must prove that those losses were incurred as a part of his business of dealing in corporations.[5]

■ We do not find it necessary to decide whether the taxpayer was engaged in the business of dealing in businesses for, whether he was or not, we hold that the record lacks sufficient evidence to support the finding that the losses in question were sustained by the taxpayer in any capacity other than that of an investor.[6]

While the taxpayer was being questioned specifically about the nature of his participation in the operation of American Tent and Awning, he failed to take advantage of numerous opportunities to indicate that his motive for acquiring an interest in that company was anything other than a hope for gain out of continuing corporate operations. Thereafter, however, the following testimony was elicited on cross examination.

Q. Was that business—by that I mean the business and not your inter-

---

1. 26 U.S.C.A. § 166(a) (1954).

2. Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); Rollins v. Commissioner, 4 Cir., 276 F.2d 368.

3. White v. United States, 305 U.S. 281, 59 S.Ct. 179, 83 L.Ed. 172 (1938).

4. Whipple v. Commissioner, 373 U.S. 193, 203, 83 S.Ct. 168, 10 L.Ed.2d 288 (1963).

5. United States v. Clark, 1 Cir., 358 F.2d 892; Campbell's Estate v. Commissioner, 2 Cir., 343 F.2d 462; United States v. Byck, 5 Cir., 325 F.2d 551.

6. See United States v. Clark, 1 Cir., 358 F.2d 892.

est in the business—ever advertised for sale?

A. No, sir.

Q. Is it correct that you made the endorsements which gave rise to the loss in question as a condition of stock ownership?

A. Yes, sir.

Q. Is it correct that the purpose for which you bought the stock in American Tent and Awning was so that you would make a profit from its operation?

A. I hoped to, yes sir.

Q. Was that the sole purpose for which you bought the stock?

A. I do not know of any other, unless I could buy it and sell it at a profit at a later date.

Q. Was that your purpose when you initially bought the stock?

A. Mr. Copely, its awfully difficult to say what your intentions were when you acquire [sic] stock or interest in a business. If the time should come that you can sell profitably, perhaps you would want to do so; if not, you might want to retain it. Its—

That, of course, is precisely the purpose of the ordinary investor in corporate stocks. He hopes, through dividend receipts, to share in subsequent corporate earnings. If the current yield on the stock is relatively low, he also has some belief that the business of the corporation is a growing one and that the value of the stock will rise with expanding corporate profits. To the extent that he looks upon the acquired stock as having a potential for growth, he hopes for capital enhancement and subsequent opportunities for the realization of capital gain. Among such ordinary investors, one would rarely find one unwilling to consider selling at a price which appeared financially advantageous.

The taxpayer's own statement of his motivation places him unequivocally in the role of an investor, not in the business of a dealer.

While evidence of his earlier activity may have warranted a finding that he had been a promoter, or something like it, there is nothing in that history which could supply a different coloration to the American Tent and Awning transaction.

In the years 1931 to 1955, Syer was principally engaged in the brokerage of sugar, but there were other business ventures. He entered into a joint venture with an inventor to develop the inventor's device, secure a patent upon it and sell the patent. There were four ventures in real estate, two of them in corporate form, one as a partnership, and the fourth a simple joint ownership. Each of the real estate corporations was wound up when the corporation's real estate was sold, while his interest in the partnership was terminated by its sale to his partners. The jointly owned land was sold after the death of the co-owner.

He acquired an interest in two truck lines, one of which he later sold to his partners and the other of which he still retained at the time of trial. For two years, until the business failed, he was a stockholder and officer of a corporation dealing in trucks and imported automobiles.

He lent financial assistance to his brother who was engaged in the manufacture of wood products and served, for a percentage of sales made by him, as a sale's agent of those products. That activity ceased when his brother effected other arrangements.

There was other activity more closely related to his sugar brokerage business. He sold the product of a vegetable canner for four years, when the canner bought him out. He was one of three partners in a grocery sales agency selling to wholesalers, until his partners bought him out. For twenty years, he owned a minority stock interest in a wholesale distributor of foods and in the real estate holding company which owned the warehouse used by the food distributor, interests which he finally sold because of his pessimistic appraisal of their future in light of the rapid expansion of chain groceries. With another, he organized a corporation

which engaged in the wholesale distribution of beer, but sold his stock to the other shareholder after a few years because his family objected to his being in the beer business.

These activities[7] do not indelibly stamp the taxpayer as a dealer in businesses in the sense of *Whipple*.[8] If, with respect to some of the transactions, the evidence might have permitted an ultimate finding that he had acted as a promoter or dealer, the predominating inference is one of investment activity. This is strongly indicated by the prolonged duration of many of his investments, some of them continuing even to the time of trial, and his withdrawal from others for such reasons as objections of his family, changes in marketing practices having an unfavorable impact on the businesses, the failure of businesses and the death of a partner or co-owner. There is no evidence that he ever advertised any of his business interests as being for sale or actively sought purchasers of them with the possible exception of sales of real estate which he owned or in which he had an interest. He was alert to take advantage of investment opportunities in relatively small businesses, but there is nothing in the history calculated to give him a reputation as a dealer in such investments or to raise an initial inference that, when he acquired his American Tent and Awning stock, he was acting in that or any similar capacity.[9] In short, there is nothing in the earlier history to counter his own declaration of his purpose in acquiring stock of American Tent and Awning, a declaration which, alone, permits no other inference than that he was acting as an investor.

The view is not altered by a closer examination of what he did after acquiring that stock interest. He rendered some services to American Tent and Awning, and, for a short time, he drew a small salary, but those circumstances are not inconsistent with investment activity in closely held corporations. Since he sought no purchasers for the stock, as a dealer would have been expected to do, those circumstances cannot diminish the impact of the testimony that he bought the stock with a view to the realization of profit from the operation of the tent and awning business.[10] To the extent that he thought at all of the possibility of a subsequent sale of the stock at a profit, his expectation was no different from that of any other investor in common stocks believed to have a potential for growth.

The taxpayer's reliance upon Giblin v. Commissioner[11] is misplaced. In *Giblin*, which in some respects is strikingly similar on its facts, there was no testimony that the taxpayer's motive for acquiring an interest in the business giving rise to the losses was to obtain profit from its operation. In the present case, the taxpayer's own testimony forecloses his claim. The Commissioner's motion for a directed verdict, on the ground that the evidence disclosed no relation between the losses and the taxpayer's business or businesses, should have been granted.

The result, of course, is not inequitable. If the business had prospered and the taxpayer had sold his stock for a profit, he would have reported his profit as a capital gain. A loss should receive the same treatment. While the losses sought to be deducted were occasioned

---

7. We do not include his ownership of stock in a bank, of which he was one of the directors from 1931 until the time of the trial. His role there had no remote resemblance to that of a promoter or dealer.

8. 373 U.S. 193, 83 S.Ct. 168, 10 L.Ed.2d 288 (1963).

9. Evidence that one had been a promoter and private banker at an earlier time does not necessarily warrant an inference that he acted in either capacity when investing funds at a later time. Ferguson v. Commissioner, 4 Cir., 253 F. 2d 403.

10. *Whipple*, 373 U.S. at 203, 83 S.Ct. 168.

11. 227 F.2d 692 (5 Cir., 1955).

immediately by his guaranty of the bank loans, his lending his credit was, in every sense, a part of his cost of acquiring the stock.

Reversed.